IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

UNITED STATES OF AMERICA )
)
v. ) CRIMINAL ACTION NO.
) 2:10cr186-MHT
MILTON E. McGREGOR, ) (WO)
THOMAS E. COKER, )
LARRY P. MEANS, )
JAMES E. PREUITT, )
HARRI ANNE H. SMITH, and )
JARRELL W. WALKER, JR. )


## OPINION

On the eve of the retrial in this public-corruption case, the government moved for a gag order limiting what the parties' trial teams could state to the media. Rather than adopting the government's proposed gag order, the court required all attorneys to comply with Alabama Rule of Professional Conduct 3.6, which provides guidelines for how lawyers should interact with the press during criminal trials. This case attracted substantial media attention and the issue of a gag order was often mentioned by attorneys and journalists. This opinion explains the court's ruling.

## I.  BACKGROUND

Gambling has been a controversial political issue in Alabama for years.  After a series of well-publicized raids against casinos in 2008, the public debate became particularly heated.  In early 2010, the Alabama State Senate took up Senate Bill 380 (SB380), which would have authorized a constitutional referendum on whether to legalize electronic bingo.[1]

The government alleged that the defendants participated in a bribery conspiracy to enact SB380.[2] Although SB380 passed the Senate, the proposed referendum stalled in the Alabama House of Representatives after the government announced its corruption investigation.

---

1.    Electronic bingo is a twenty-first century version of the familiar game played in elementary schools and fire halls around the country.  Rather than using physical cards and markers, however, electronic bingo machines digitize the experience while still pitting players against one another to win a prize.

2.    Given the numerous opinions already issued in this case, the court assumes a certain familiarity with the facts.  For a thorough discussion of this litigation, see United States v. McGregor, __ F. Supp. 2d __, 2011 WL 5025835 (M.D. Ala. Oct. 20, 2011).

Several months later, in October 2010, the government unsealed its indictment against eleven defendants.  Given the political atmosphere, the indictment of two prominent casino owners (Milton E. McGregor and Ronald E. Gilley) and four state senators (Larry P. Means, James E. Preuitt, Harri Anne H. Smith, and Quinton T. Ross, Jr.) was widely covered throughout the State.  Notwithstanding the inherent newsworthiness of this case, both sides helped amplify the coverage.

The bulk of the government's interactions with the press came during the pretrial phase of this proceeding. Assistant Attorney General Lanny Breuer held a press conference at the Department of Justice in Washington, D.C., to announce the indictment.  When McGregor was arrested at his home, someone tipped off the news media about the event.  The government also issued press releases when defendants Jarrod D. Massey and Gilley pled guilty in December 2010 and April 2011, respectively.

During and since the first trial, the government has taken a more stoic approach.[3]

Attorneys for McGregor, Smith, and Jarrell W. Walker, Jr. were particularly vocal during the first trial.[4]  On a nearly daily basis, attorneys Joe Espy (McGregor), Jim Parkman (Smith), and Susan James (Walker) would talk to the press as they left the courthouse.  During these news conferences, the attorneys would comment on the credibility of the witnesses, discuss trial strategy, and speculate as to the cooperating witnesses' motives in testifying.

During the first trial, the story featured prominently in local newspapers and newscasts.  Local media developed a live blog and a Twitter account

---

3.  However, the government issued a press release when former Alabama state legislator Terry Spicer pled guilty in November 2011.  Spicer pled guilty to accepting bribes from Massey and Gilley.  Spicer was not a defendant in this case.

4.  Ross's attorneys also held press conferences, but, as Ross was acquitted on all counts at the first trial, he was not a defendant in the retrial.

dedicated to the trial. Updates concerning the trial were posted on an almost minute-by-minute basis.

One particular revelation at the first trial garnered national media attention. In conducting its investigation, the FBI gave State Senator Scott Beason a wire to wear during his meetings with the defendants. Beason, however, kept the recording device running while talking to members of the Alabama Republican Party. During Beason's cross-examination at the first trial, it was revealed that Beason and other Republican politicians were recorded making racist statements directed at Africa-American voters. <u>See</u> McGregor's Brief (Doc. No. 2168) at 9 n.5; <u>United States v. McGregor</u>, __ F. Supp. 2d __, 2011 WL 5025835, *2 to *5 (M.D. Ala. Oct. 20, 2011).

Because of this media presence, the court took special care to minimize jurors' exposure to the media. A designated area outside the courthouse was established for the media. The jurors were instructed to enter and exit the courthouse through an entrance on the other side

of the building.  The court also set up an over-flow room where journalists could watch the court proceedings via closed-circuit video; no televised images of the trial aired publicly.  Once the jury panel was selected, the court issued preliminary jury instructions ordering jurors scrupulously to avoid media coverage of the trial.

At the conclusion of the first trial, the jury found two defendants not guilty on all counts.  For the other seven defendants, the jury found them not guilty on some counts, but was unable to reach a verdict on the remaining counts.

In the six months between the first trial and the retrial, the case remained a prominent feature of Alabama politics.  McGregor points out that State Senator Beason has cited his participation in the case in his primary campaign to unseat an incumbent member of the United States House of Representatives.  McGregor also submitted mass-mailings sent out by religious organizations; while the general thrust of these fliers is anti-gambling, the

**6**

trial is referenced as evidence of gambling's corruptive nature.  For its part, the government was concerned about defense counsel's comments to the media regarding whether Beason and other government witnesses would testify at the retrial.[5]

For the retrial, voir dire focused extensively on potential jurors' knowledge of the first trial.  The court also adopted the first trial's practices regarding the media and jury sequestration.  The retrial ended with the jury acquitting the six remaining defendants.

## II.  GOVERNMENT'S PROPOSED GAG ORDER

Shortly before the retrial, the government moved for a gag order, which proposed that "apart from court hearings or filings, no participating attorney or any member of their trial team shall make any extrajudicial

---

5.  The day before the retrial was scheduled to begin, defendant Joseph R. Crosby died of natural causes. The court delayed the retrial for a week, until February 6, 2012.  Crosby's untimely death sparked even more media coverage of the case.

comments about this case which a reasonable person would believe could be publicly disseminated." Proposed Gag Order (Doc. No. 2145-1) at 3. By its terms, the order placed no limits on the defendants themselves. The order would also have not limited the media's reporting on the trial.

The government's proposal did have exceptions, however. The gag order did not "apply to statements that disseminate information regarding scheduling matters or other materials that are a part of the public record, so long as those statements are limited to bare facts as opposed to opinions, questions, or commentary." Id. Thus, the attorneys could inform the press that a specific witness would be testifying the next day or direct the press to examine a recent filing.

## III. STANDARD FOR A GAG ORDER

A gag order is a prior restraint on speech and, as such, is "the most serious and the least tolerable

infringement on First Amendment rights." Nebraska Press Ass'n v. Stuart, 427 U.S. 539, 559 (1976).  With the specter of an "immediate and irreversible sanction," a prior restraint not only "chills" speech, it "'freezes' it at least for the time."  Id.  Accordingly, "[a]ny system of prior restraints of expression ... bear[s] a heavy presumption against its constitutional validity." New York Times Co. v. United States, 403 U.S. 713, 714 (1971) (per curiam).

"The exercise of First Amendment rights, however, can sometimes imperil the administration of fair criminal trials." United States v. Carmichael, 326 F. Supp. 2d 1267, 1291 (M.D. Ala. 2004) (Thompson, J.).  As such, "[a]lthough litigants do not surrender their First Amendment rights at the courthouse door, those rights may be subordinated to other interests that arise" during a criminal trial.  Seattle Times Co. v. Rhinehart, 467 U.S. 20, 32 n.18 (1984) (internal quotation marks and citation omitted).

The paradigmatic example of a clash between the First and Sixth Amendments occurs when trial publicity prejudices a defendant. See Stuart, 427 U.S. at 547-48 (noting that this tension first arose in American history during the trial of the British soldiers involved in the Boston Massacre). As the Supreme Court has explained: "Due process requires that the accused receive a trial by an impartial jury free from outside influences. Given the pervasiveness of modern communications and the difficulty of effacing prejudicial publicity from the minds of the jurors, the trial courts must take strong measures to ensure that the balance is never weighted against the accused." Sheppard v. Maxwell, 384 U.S. 333, 362 (1966). Although most cases of pretrial publicity concern prejudice to the defendant, the "concept of a fair trial applies both to the prosecution and the defense." United States v. Tijerina, 412 F.2d 661, 666 (10th Cir. 1969). See also Carmichael, 326 F. Supp. 2d at 1291 ("While the Sixth Amendment does not explicitly

protect the government, the government still has a strong interest in a fair trial.").[6]

To safeguard these Sixth Amendment rights to a fair trial, courts have issued gag orders against defendants, trial attorneys, and even the press itself. Thus, despite the constitutional presumption against gag orders, they are not unprecedented. See, e.g., United States v. Brown, 218 F.3d 415 (5th Cir. 2000) (upholding gag order against trial participants).

Here, the government sought a prior restraint against only the parties' attorneys. Neither the Supreme Court nor the Eleventh Circuit Court of Appeals has ever directly decided the appropriate standard for a gag order imposed on attorneys in an ongoing criminal trial. See The News-Journal Corp. v. Foxman, 939 F.2d 1499, 1515-16

---

6. Some courts have taken a different approach and discounted the government's interest in a fair trial when the defendant instigates the publicity. See United States v. Ford, 830 F.2d 596, 600 (6th Cir. 1987) ("To the extent that publicity is a disadvantage for the government, the government must tolerate it. The government is our servant, not our master.").

**11**

(11th Cir. 1991) (declining to resolve issue on <u>Younger</u> abstention grounds); <u>United States v. Scrushy</u>, 2004 WL 848221, *2 (N.D. Ala. Apr. 13, 2004) (Bowdre, J.) (noting the uncertainty in this area of law). Nevertheless, two Supreme Court decisions provide guidance on this issue.

In <u>Nebraska Press Ass'n v. Stuart</u>, 427 U.S. 539 (1976), the trial court issued a gag order against members of the press. The trial court's goal was to abate prejudicial reporting against a defendant charged with committing multiple homicides in a rural, small town. In vacating the gag order, the Supreme Court looked to four factors: "the nature and extent of pretrial coverage"; "whether other measures would be likely to mitigate the effects of unrestrained pretrial publicity"; "how effectively a restraining order would operate to prevent the threatened danger"; and "the precise terms of the restraining order." <u>Id</u>. at 562. Courts have read <u>Stuart</u> as establishing that there must be a "clear and present danger" of prejudice before a

court may issue a prior restraint against the media. <u>Ford</u>, 830 F.2d at 598.

In <u>Gentile v. State Bar of Nevada</u>, 501 U.S. 1030 (1991), a defense attorney was punished by a state bar for making extrajudicial comments. Borrowing a standard from the bar rules of over 30 States and the American Bar Association (ABA), <u>id</u>. at 1068, the Supreme Court held that the appropriate standard for the punishment of attorney speech was whether it presented a "substantial likelihood of material prejudice." <u>Id</u>. at 1075. Thus, regulating attorney speech requires a "less demanding standard than that established for regulation of the press in <u>Nebraska Press Assn. v. Stuart</u>." <u>Id</u>. at 1074. The Court also required that any bar disciplinary rules be narrowly tailored. <u>Id</u>. at 1075-76.

The question, then, is which standard applies to a prior restraint issued against trial attorneys. On the one hand, <u>Stuart</u> mandates a "clear and present danger" standard for cases involving prior restraint and the

media.  On the other hand, <u>Gentile</u> establishes a lower standard for punishing attorneys after the fact.

The Circuit Courts of Appeals are divided over this issue.  The Sixth, Seventh, and Ninth Circuits have adopted the "clear and present danger" standard.  <u>See</u> <u>Ford</u>, 830 F.2d at 598; <u>Levine v. U.S. District Court</u>, 764 F.2d 590, 595 (9th Cir. 1985); <u>Chicago Council of Lawyers v. Bauer</u>, 522 F.2d 242, 249 (7th Cir. 1975).  By contrast, the Third and Fifth Circuits have adopted the "substantial likelihood of material prejudice" standard.  <u>See</u> <u>United States v. Scarfo</u>, 263 F.3d 80, 94 (3d Cir. 2001); <u>Brown</u>, 218 F.3d at 427.  Finally, the Fourth and Tenth Circuits have adopted a "reasonable likelihood" of prejudice standard.  <u>See</u> <u>In re Russell</u>, 726 F.2d 1007, 1010 (4th Cir. 1984); <u>Tijerina</u>, 412 F.2d at 666.

This court itself has addressed the appropriate standard for issuing a gag order against a defendant. In <u>Carmichael</u>, a criminal defendant posted a website and bought a newspaper advertisement seeking information on

potential witnesses and government informants. The court reasoned: "The fact that the protective order in this case would burden only the defense calls for a higher threshold standard of proof." Carmichael, 326 F. Supp. 2d at 1294. Thus, the court adopted the clear and present danger standard as the requisite standard of proof. Id. This court incorporated that threshold showing into the four-part Stuart test and ultimately rejected the government's gag order. Id. at 1301.

Here, for several reasons, the court found that Gentile's "material likelihood of substantial prejudice" standard controlled. First, the gag order was directed at all attorneys in the case; it was not one-sided. The gag order did not apply to the media or the defendants themselves. This salient fact distinguished this gag order from those rejected in Stuart and Carmichael. Most importantly, the media was still able to attend the trial and report on public proceedings.

Second, the circuit courts that have adopted the "clear and present danger" standard did so before the Supreme Court articulated the less-demanding <u>Gentile</u> test. <u>See</u> <u>Brown</u>, 218 F.3d at 427. These decisions' precedential value, therefore, has been significantly undermined by intervening Supreme Court authority. <u>Cf</u>. <u>Randall v. Scott</u>, 610 F.3d 701, 707 (11th Cir. 2010) (discussing how an intervening Supreme Court decision permits the overruling of circuit precedent).

Third, <u>Gentile</u> contains strong language about attorneys' obligations as agents of the court. <u>See</u>, <u>e.g.</u>, <u>Gentile</u>, 501 U.S. at 1074 ("Lawyers representing clients in pending cases are key participants in the criminal justice system, and the State may demand some adherence to the precepts of that system in regulating their speech."). The <u>Gentile</u> Court justified a less-rigorous standard because an attorney is an agent of the court, not because the restriction at issue was a post-hac disciplinary proceeding instead of a prior restraint.

Fourth, <u>Gentile</u> explicitly adopted its standard from the majority of state bar associations' codes for attorney conduct with the press during trials. These rules impose significant restrictions on attorney speech notwithstanding any court-imposed limitations. Alabama has a similar rule of professional conduct--which will be discussed in more detail below--and the attorneys in this litigation were expected to abide by it.

Thus, a court should issue a gag order only if (1) the attorneys' speech presents a substantial likelihood of material prejudice to the proceedings; (2) the proposed protective order is narrowly tailored; (3) alternatives to the protective order would not be effective; and (4) the order would be effective in achieving the government's goal. <u>Cf</u>. <u>Carmichael</u>, 326 F. Supp. 2d at 1294 (adopting a similar four-factor test but with a "clear and present danger" standard because the defendant's speech was at issue).

## IV. DISCUSSION

Prior restraints are not the only means of restricting an attorney's extrajudicial remarks. Rules of professional conduct have regulated the bar's relationship with the press since the Alabama Code of 1887, which was "the first official code of legal ethics promulgated in this country." <u>Gentile</u>, 501 U.S. at 1066. When it adopted the ABA's "substantial likelihood of material prejudice" standard, the <u>Gentile</u> Court endorsed these professionally developed rules for attorney conduct.

Alabama Rule of Professional Conduct 3.6 regulates "trial publicity." As the Alabama Bar explained when it adopted the rule: "Preserving the right to a fair trial necessarily entails some curtailment of the information that may be disseminated about a party prior to trial, particularly where trial by jury is involved. If there were no such limits, the result would be the practical nullification of the protective effect of the rules of

forensic decorum and the exclusionary rules of evidence."
Ala. R. Prof. Conduct 3.6 Comments.  Rule 3.6 mirrors the
ABA rules discussed in <u>Gentile</u>.

Rule 3.6 has a tripartite structure.  Rule 3.6(a)
delineates the general prohibition on extrajudicial
remarks:

> "(a) A lawyer shall not make an
> extrajudicial statement that a
> reasonable person would expect to be
> disseminated by means of public
> communication if the lawyer knows or
> reasonably should know that it will have
> a substantial likelihood of materially
> prejudicing an adjudicative proceeding."

Rule 3.6(b) then provides examples of comments that
are "ordinarily" "likely" to result in "a substantial
likelihood of materially prejudicing" a criminal trial:

> "(1) the character, credibility,
> reputation or criminal record of a
> party, suspect in a criminal
> investigation or witness, or the
> identity of a witness, or the expected
> testimony of a party or witness;
>
> "(2) in a criminal case or proceeding
> that could result in incarceration, the
> possibility of a plea of guilty to the
> offense or the existence or contents of

any confession, admission, or statement given by a defendant or suspect or that person's refusal or failure to make a statement;

...

"(4) any opinion as to the guilt or innocence of a defendant or suspect in a criminal case or proceeding that could result in incarceration;

"(5) information the lawyer knows or reasonably should know is likely to be inadmissible as evidence in a trial and would if disclosed create a substantial risk of prejudicing an impartial trial; or

"(6) the fact that a defendant has been charged with a crime, unless there is included therein a statement explaining that the charge is merely an accusation and that the defendant is presumed innocent until and unless proven guilty."

Next, Rule 3.6(c) provides a "safe harbor" provision that allows attorneys to make certain factual statements about pending litigation. Under Rule 3.6(c), an attorney may "state without elaboration":

"(1) the general nature of the claim or defense;

"(2) the information contained in a public record;

"(3) that an investigation of the matter is in progress, including the general scope of the investigation, the offense or claim or defense involved and, except when prohibited by law, the identity of the persons involved;

"(4) the scheduling or result of any step in litigation;

"(5) a request for assistance in obtaining evidence and information necessary thereto;

"(6) a warning of danger concerning the behavior of a person involved, when there is reason to believe that there exists the likelihood of substantial harm to an individual or to the public interest; and

"(7) in a criminal case:

(i) the identity, residence, occupation and family status of the accused;

(ii) if the accused has not been apprehended, information necessary to aid in apprehension of that person;

(iii) the fact, time and place of arrest; and

(iv) the identity of investigating and arresting officers or agencies and the length of the investigation."

Finally, Rule 3.6(c)(8), which was added in 2008, authorizes attorneys to respond to trial publicity:

"(8) Notwithstanding paragraphs (a) and (b) above, a lawyer may make a statement that a reasonable lawyer would believe is required to protect a client from the substantial undue prejudicial effect of recent publicity not initiated by the lawyer or the lawyer's client. A statement made pursuant to this paragraph shall be limited to such information as is necessary to mitigate the recent adverse publicity."

Rule 3.6 is particularly instructive because an "attorney's ethical obligations to refrain from making prejudicial comments about a pending trial will exist whether a gag order is in place or not." Brown, 218 F.3d at 428. With this background in mind, the court used Rule 3.6 as a guidepost in determining whether the attorneys' comments made during the first trial satisfied the Gentile standard.

A.  Substantial Likelihood of Material Prejudice

The Supreme Court has instructed that gag orders address "two principal evils: (1) comments that are likely to influence the actual outcome of the trial, and (2) comments that are likely to prejudice the jury venire, even if an untainted panel can ultimately be found." Gentile, 501 U.S. at 1075.  Because this case was discussed publicly for nearly two years and the gag order was requested only 10 days before the scheduled start of the retrial, the court focused on the former "evil."  Further comments were unlikely to taint the jury venire, the questioning of which was particularly searching.

In support of its gag order, the government provided lengthy quotes from the defendants' press conferences during the first trial.  The comments had a unifying theme: the defendants' attorneys sought to discredit the government's witnesses in the eyes of the public.  To take a few examples:

● "This is the kind of a comment, I heard up in the courthouse, somebody said, How can you tell [Gilley's] testifying falsely? And they said, His lips are moving, aren't they." Doc. No. 2145, Ex. 3 (Espy).

● "When [lobbyist Jennifer Pouncy] initially talked with the government, the things she talked then when they where fresh in her mind, today are not fresh in her mind and they contradict what she said earlier." Doc. No. 2145, Ex. 5 (Espy).

● "Is Scott Beason a credible witness? No. Do you think he is? No. Not at all. Those days are gone." Doc. No. 2145, Ex. 2 (Parkman).

● "I'm not sure God himself could rehabilitate [Beason]." Doc. No. 2145, Ex. 2 (Parkman).

● "If [Gilley's] going to not spend twenty years in the penitentiary, he's got to make the prosecution happy and there's not but one way to make the prosecution happy, and that's to put it on Mr. McGregor and the other defendnats as hard and as strong as he can." Doc. No. 2145, Ex. 3 (Espy).

● "I think the most interesting thing of the whole day was the hesitation on the government's part when they were asked if they were gonna put Massey on the stand. I think that was the key of the whole day. The hesitation and the hiccup." Doc. No. 2145, Ex. 3 (Espy).

● "[The juror's note is] just a sign of what one person thought and raised, you know, but if one person saw that early enough, they're at least questioning, I think the propriety of the case, and

24

they had to have gotten that from the tapes." Doc. No. 2145, Ex. 10 (James).

The defendants' attorneys' comments fit squarely within the list of "ordinarily" prejudicial statements. In particular, defense counsel opined on the credibility of witnesses and speculated as to the government's trial strategy and jury deliberations. Defense counsel's statements also fall outside the narrow exceptions provided in the notwithstanding clause. The frequency, intensity, and ubiquity of defense counsel's remarks made it far more probable that the jury would become aware of the extrajudicial comments. Given these considerations, the government satisfied the prejudice prong of the Gentile test.

The defendants asserted that their comments fall within Rule 3.6(c)(8)'s exception for comments made to respond to trial publicity that was not "not initiated by the lawyer or the lawyer's client." The court was unpersuaded by this argument for two reasons.

First, the text, structure, and purpose of Rule 3.6 concerns extrajudicial statements. <u>See</u>, <u>e.g.</u>, Rule 3.6(a) ("A lawyer shall not make an <u>extrajudicial</u> statement....") (emphasis added). Defense counsel's remarks to the media were made after events as they occurred during the first trial. If Rule 3.6(c)(8)'s right-to-respond was expanded to include extrajudicial rebuttals to in-court testimony, the results would be absurd. For instance, the Rule specifically limits the right-to-respond to "publicity" not "initiated" by the defendants or their attorneys. But defense counsel often commented on testimony that they had elicited during cross-examination. The controversial remarks by Scott Beason are the most prominent example from the first trial. Put simply, in-court testimony is not "publicity" for purposes of Rule 3.6. A right-to-respond to in-court testimony would eviscerate Rule 3.6 by allowing every defense attorney to "respond" to any witness testimony with a news conference. In-court proceedings (including

cross-examination of witnesses and arguments to the jury and the judge) are, in general, the proper venue and means for responding to events in court.

To be clear, a defendant has a right-to-respond to extrajudicial comments made by a non-party and a non-witness. Here, McGregor has provided a perfect example: Religious organizations sent mass-mailings criticizing gambling and citing the trial as an example of gambling's corruptive effect. Under Rule 3.6, McGregor and his attorneys had a right-to-respond to such comments.

Second, defense counsel's rebuttals went well beyond that contemplated by Rule 3.6(c)(8), which requires that a "statement made pursuant to this paragraph shall be limited to such information as is necessary to mitigate the recent adverse publicity." Defense counsel's comment that government witnesses could not be rehabilitated by "God himself," Doc. No. 2145, Ex. 2 (Parkman), is an opinion, not the type of factual information protected by Rule 3.6(c)(8).

27

B.  Narrowly Tailored

The government's proposed gag order was narrowly tailored in two respects.  First, the gag order applied only to the attorneys and trial team members, not to the media or the defendants themselves.  This is a crucial distinction and the reason why the "substantial likelihood of material prejudice" standard applies.

Second, the proposed order was not a "no comment" rule.  Under the government's proposed gag order, the attorneys were still allowed to provide "bare facts" to the media about scheduling issues and court filings.  As government counsel conceded during an on-the-record conference, a defense attorney would be free to stand outside the courthouse and read from a filed motion or a transcript of a witnesses' testimony.

C.  Least Restrictive Alternative

The government could not show why other less restrictive means were insufficient.  The familiar list

of alternative options include: continuing or transferring the case; sequestration of the jury; extensive voir dire; and emphatic jury instructions. See Gentile, 501 U.S. at 1075; Brown, 218 F.3d at 430-31. Neither party requested a continuance or change-of-venue due to trial publicity.

As to jury sequestration, the government claimed that it was amenable to this option as an alternative to the gag order. But the sequestration of a jury for what was scheduled to be a two-month trial was a particularly harsh antidote to the problem of publicity. The imposition of such a lengthy sequestration on everyday citizens should be used only as a last resort.

Regarding voir dire and jury instructions, the court found that these options mitigated the need for a gag order. Given this case's prominence in Alabama politics for the past two years and the reporting surrounding the first trial, voir dire was especially searching. Once an untainted panel was seated, the court reiterated its jury

instructions from the first trial about avoiding trial publicity.

Finally, and most importantly, the court found that attorney adherence to Rule 3.6 was a less restrictive alternative to the government's proposed gag order. The government sought to limit attorneys to "bare facts" discussions with the media. The government's gag order would have been backed up by the threat of court sanction if it was violated. By contrast, adherence to the Alabama Rules of Professional Conduct provided some leeway. Rule 3.6(b) provides a list of statements that are "ordinarily" "likely" to violate Rule 3.6(a). But Rule 3.6(b) creates only a rebuttable presumption. For example, because the jury was sequestered during deliberations, extrajudicial comments made to the media would carry less risk of prejudice than if the jurors were free to read the newspaper at home.

## D. Effectiveness

The court further notes that the government's proposed gag order was unlikely to be effective. Even in the absence of a news conference on the courtroom steps, the media still camped outside the courthouse, reported daily on the proceedings, and continued the live blog of the witness testimony. This litigation concerned issues too salient to be ignored by the media. Furthermore, the press understood that defense counsel attempted to discredit the government's witnesses when they took the stand. A cursory overview of the Twitter feed, which was created in real-time without the aid of extrajudicial comments, reveals as much.

## E. The Court's Resolution

The court declined to grant the government's proposed gag order because it was not the least restrictive alternative and it would not have been fully effective in curbing trial publicity. Instead, the court adopted a

**31**

middle-ground approach: instructing the attorneys to follow the guidelines embodied in Alabama Rule of Professional Conduct 3.6. The court emphasized that comments about a witness's credibility would be disfavored and presumptively prejudicial.

"Because of their legal training, attorneys are knowledgeable regarding which extrajudicial communications are likely to be prejudicial." <u>Foxman</u>, 939 F.2d at 1515 n.18. The court, therefore, was confident that the attorneys in this litigation were capable of following Rule 3.6. Indeed, defense counsel still spoke to the press during the retrial, but did not repeat the incendiary comments about the government's witnesses that were made at the first trial. Attorney compliance with state bar rules provides a legitimate alternative to more restrictive gag orders.

\* \* \*

A gag order is a prior restraint on speech. As such, the court engaged in a rigorous First Amendment inquiry.

Because the government's proposed gag order targeted only the attorneys and not the defendants or the media, the court had to determine whether extrajudicial comments created a substantial likelihood of material prejudice to the proceedings.  Furthermore, a gag order had to be narrowly tailored and could only be granted if less burdensome alternatives were ineffective.

The court declined to impose the government's proposed gag order.  The court, however, attempted to strike a balance between defense counsel's First Amendment rights and the government's interest in a fair trial.

Accordingly, rather than granting the government's motion for a gag order (Doc. No. 2145), the court employed the less restrictive alternative of requiring the attorneys and their trial teams to comply with Alabama Rule of Professional Conduct 3.6.  The court found that the Rule 3.6 alternative worked well.

DONE, this the 14th day of March, 2012.

/s/ Myron H. Thompson
UNITED STATES DISTRICT JUDGE