IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIMINAL ACTION NO. |
| | ) | 2:10cr186-MHT |
| MILTON E. McGREGOR, | ) | (WO) |
| THOMAS E. COKER, | ) | |
| LARRY P. MEANS, | ) | |
| JAMES E. PREUITT, | ) | |
| HARRI ANNE H. SMITH, and | ) | |
| JARRELL W. WALKER, JR. | ) | |

## OPINION

During both the original trial and the retrial of this public-corruption case, the court in its instructions to the jury provided a definition of a quid pro quo. The court is of the opinion that these instructions should be memorialized and made more accessible to the public.

## I.  THE COURT'S JURY INSTRUCTIONS

Extortion, federal-programs bribery, and honest-services mail and wire fraud are different crimes with distinct elements.  For all these counts, however, the

court treated a "quid pro quo" as an element of the offense. Cf. United States v. Siegelman, 640 F.3d 1159, 1170 (11th Cir. 2011) (noting that "the Supreme Court has not yet considered whether the federal funds bribery, conspiracy or honest services mail fraud statutes require" a quid pro quo). For counts alleging the offering of a campaign-contribution bribe, the court developed a heightened quid pro quo standard and instructed the jury that:

> "For a defendant to be guilty under this statute, the government must prove that there was a quid pro quo. The term 'quid pro quo' is Latin for 'this for that,' or 'these for those.' For all of the alleged bribes in these counts, the thing of value allegedly promised or exchanged took the form of a campaign contribution. Campaign contributions and fundraising are an important, unavoidable and legitimate part of the American system of privately financed elections. The law recognizes that campaign contributions may be given to an elected public official because the giver supports the acts done or to be done by the elected official. The law thus also recognizes that legitimate, honest campaign contributions are given to reward public officials with whom the

donor agrees, and in the generalized hope that the official will continue to take similar official actions in the future.

"Lobbyists, as well as private individuals and other entities, often donate to the political campaigns of public officials and there is nothing illegal about this practice. Official acts that advance the interests of a lobbyist's clients, taken shortly before or after campaign contributions are solicited or received from the lobbyist, can, depending on the circumstances, be perfectly legal and appropriate.

"Therefore, the solicitation or acceptance by an elected official of a campaign contribution does not, in itself, constitute a federal crime, even though the donor has business pending before the official, and even if the contribution is made shortly before or after the official acts favorably to the donor.

"However, when there is a quid pro quo <u>agreement</u>, orally or in writing, that is, a mutual understanding, between the donor and the elected official that a campaign contribution is conditioned on the performance of a <u>specific official action</u>, it constitutes a bribe under federal law. By this phrase, I mean that a generalized expectation of some future favorable action is not sufficient for a quid pro quo agreement;

rather, the agreement must be one that the campaign contribution will be given in exchange for the official agreeing to take or forgo some specific action in order for the agreement to be criminal. A close-in-time relationship between the donation and the act is not enough to establish an illegal agreement.

"A <u>promise</u> of a campaign contribution or a <u>solicitation</u> of a campaign contribution may be an illegal quid pro quo, as well. But to be illegal (1) it must be a promise or solicitation conditioned on the performance of a specific official action as I explained that phrase in the preceding paragraph; (2) it must be <u>explicit</u>; and (3) it must be <u>material</u>. To be explicit, the promise or solicitation need not be in writing but must be clearly set forth. An explicit promise or solicitation can be inferred from both direct and circumstantial evidence, including the defendant's words, conduct, acts, and all the surrounding circumstances disclosed by the evidence, as well as the rational or logical inferences that may be drawn from them.

"Finally, the word material is a legal term, and it does not indicate whether something is tangible or intangible. Rather, it means that the promise or solicitation is one that a reasonable person would view as having the capacity or natural tendency to influence a person's decision. It does not matter

> whether the decision-maker actually
> accepted the promise or solicitation and
> acted accordingly.  Again, a close-in-
> time relationship between the donation
> and the act is not enough to establish
> an illegal promise or solicitation."

Jury Instructions (Doc. No. 2388) at 20-24 (emphasis in original).

## II.  BACKGROUND

The indictment charged the defendants with federal-programs bribery, extortion, honest-services mail and wire fraud, money laundering, making a false statement, obstruction of justice, and conspiracy to commit federal-programs bribery.[1]  Of particular importance here, the government alleged that several of the bribes were to be given as campaign contributions instead of money to be used by the politician for his or her personal benefit. For instance, Count 5 of the indictment charged a

---

1.  Given the numerous opinions already issued in this case, the court assumes a certain familiarity with the facts.  For a thorough discussion of this litigation, see United States v. McGregor, 824 F. Supp. 2d 1339 (M.D. Ala. 2011).

defendant with promising "to give campaign contributions, including promises of $ 100,000 and other unspecified amounts," to a defendant state senator.  Indictment (Doc. No. 3) at ¶ 198.  As alleged in the indictment, campaign contributions were involved in counts charging federal-programs bribery, extortion, and honest-services mail and wire fraud.

Because campaign contributions implicate significant First Amendment rights, courts have fashioned heightened standards of proof to ensure that protected political activity is not criminalized or unduly chilled.  These standards, however, are not a model of clarity.  While eight defendants have been acquitted of all charges and this case is now over, the court writes on this issue to highlight a murky field of federal law.

## III.  QUID PRO QUO

Corruption undermines democratic institutions and distorts the representative process by substituting

private interests for the will of the people.  The public will have confidence in their government only if their <u>votes</u> matter.  A vibrant democracy cannot ignore corruption in its midst.

Of course, corruption takes many forms.  A bureaucrat can extort a business owner when approving a license.  A police officer can pocket drugs and look the other way.  And a politician can direct a government contract to a company in exchange for a personal check.

Those are relatively clear-cut examples.  Bribes to unelected government officials often do not raise constitutional questions because those payments cannot be construed as campaign contributions.  But corruption can take a more sophisticated form.  Whenever private donations fund political campaigns, there is always potential for a bribe to masquerade as a campaign contribution.

Candidates and donors have a First Amendment right to accept or give campaign contributions, so long as those

payments are not bribes. Indeed, the Supreme Court defines campaign contributions as political speech but has upheld limitations on campaign contributions to candidates in the interest of preventing corruption or the appearance of corruption. <u>Buckley v. Valeo</u>, 424 U.S. 1, 19-25 (1976). Politicians and citizens may also have a due-process right to know what political activity is legal. Fair notice allows individuals to engage in politics with full knowledge of the legal parameters.

These concerns are particularly salient because private funding of campaigns is the norm in the American system of government. Regardless of whether a candidate is running for president or city council, he or she must raise substantial sums of money for advertisements, support staff, and get-out-the-vote efforts. Candidates typically call potential donors, hear their concerns, and request a contribution. For donors, campaign contributions are a way of participating in the political process and expressing support for their candidate of

choice.  Given this political reality, distinguishing an illicit bribe from a genuine donation is sometimes no easy task.

To illustrate this line-drawing problem, the court borrows an example that the defendants frequently cited as a model of legitimate campaign contributions.  In June 2011, New York legalized same-sex marriages.  Some Republican lawmakers who provided the decisive votes subsequently received significant campaign contributions from gay marriage supporters.  This fact was widely reported in the media, which assumed that such conduct was predictable, proper, and legal.  McGregor's Brief (Doc. No. 1913) at 2-6 (discussing Thomas Kaplan, <u>A Campaign Windfall for 4 Republicans Who Voted For Same-Sex Marriage</u>, N.Y. Times, Oct. 12, 2011, http://www.nytimes.com/2011/10/13/nyregion/4-republicans-who-voted-for-gay-marriage-set-to-receive-aid.html).  The defendants challenged the government to demonstrate

how their advocacy of pro-gambling legislation was any
different from this behavior.

This example begs the question: when is a campaign
contribution a bribe? It is axiomatic that citizens give
money to politicians that they support.  But a campaign
contribution transforms into a bribe when it is tied to
a specific act.  In other words, when there is a quid pro
quo or a "this for that."

Three cases provide guidance on the definition of
quid pro quo.  In the first two, the Supreme Court
demarcated the general boundaries of a quid pro quo.
More recently, the Eleventh Circuit Court of Appeals
refined the standard.  The court addresses each in turn.


A.  <u>McCormick</u> and Quid Pro Quo

In <u>McCormick v. United States</u>, 500 U.S. 257 (1991),
the Supreme Court held that a quid pro quo was necessary
for a conviction for extortion under the Hobbs Act, 18
U.S.C. § 1951.  McCormick was a West Virginia state

legislator who supported a program that gave temporary medical licenses to foreign doctors. In 1984, after the state legislature moved to eliminate the program, an organization of foreign doctors hired a lobbyist, Vandergrift, to advocate their interests. McCormick and Vandergrift discussed ways to extend the licensing program. After McCormick sponsored a bill that renewed the licensing program in 1984, McCormick and Vandergrift discussed introducing a similar bill in 1985.

During his 1984 re-election campaign, McCormick mentioned to Vandergrift that "his campaign was expensive, that he had paid considerable sums out of his own pocket, and that he had not heard anything from the foreign doctors." McCormick, 500 U.S. at 260. Vandergrift said that he would talk to the foreign doctors and see what he could do to help. Shortly thereafter, Vandergrift gave McCormick several thousand dollars in cash. In 1985, McCormick sponsored and helped enact a bill that permitted experienced doctors to obtain

a permanent license without passing the state's medical exam.  Two weeks after the legislation passed, McCormick received another cash payment from the foreign doctors. <u>Id</u>.

McCormick was charged under the Hobbs Act, which defines extortion as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right."  <u>Id</u>. at 261 n.2 (quoting 18 U.S.C. § 1951(b)(2)).  Because there were no allegations of force, violence or fear, the question presented was the meaning of the Hobbs Act's "color of official right" language.  <u>Id</u>. at 259.  McCormick argued that the cash payments were campaign contributions and, therefore, exempt from the Hobbs Act's "color of official right" language.  <u>Id</u>. at 274 n.10.

The Supreme Court recognized that an extortion conviction for receiving campaign contributions was

fraught with constitutional and pragmatic concerns.  As

the Court explained:

> "Money is constantly being solicited on
> behalf of candidates, who run on
> platforms and who claim support on the
> basis of their views and what they
> intend to do or have done. Whatever
> ethical considerations and appearances
> may indicate, to hold that legislators
> commit the federal crime of extortion
> when they act for the benefit of
> constituents or support legislation
> furthering the interests of some of
> their constituents, shortly before or
> after campaign contributions are
> solicited and received from those
> beneficiaries, is an unrealistic
> assessment of what Congress could have
> meant by making it a crime to obtain
> property from another, with his consent,
> 'under color of official right.'"

Id. at 272.  Thus, a mutuality of interest or a close-in-

time connection between a donation and an official act is

insufficient to sustain a conviction under the Hobbs Act.

Despite these concerns, the McCormick Court held that

campaign contributions could form the basis for an

extortion conviction.  To obtain a conviction under the

Hobbs Act's "color of official right" language, the

government must establish a "quid pro quo." Id. at 273.

See also id. at 274 ("We thus disagree with the Court of Appeals' holding in this case that a quid pro quo is not necessary for conviction under the Hobbs Act when an official receives a campaign contribution."). In other words, the government must prove beyond a reasonable doubt that a campaign contribution was "made in return for an explicit promise or undertaking by the official to perform or not to perform an official act. In such situations the official asserts that his official conduct will be controlled by the terms of the promise or undertaking." Id. at 273 (emphasis added).

Thus, McCormick makes clear that a quid pro quo is required for a conviction when a campaign contribution is alleged to be a bribe. The Court defined a quid pro quo as a "this for that." A bribe needs to be in exchange for a specific official act or omission. The McCormick Court, however, did not expand on what constitutes an

14

"explicit promise or undertaking."  The definition of
"explicit" remains hotly contested.


   B.  <u>Evans</u> and Inducement

   A year after <u>McCormick</u>, the Supreme Court decided
another case about the scope of the Hobbs Act.  In <u>Evans</u>
<u>v. United States</u>, 504 U.S. 255 (1992), the Court
addressed whether "an affirmative act of inducement by a
public official, such as a demand, is an element of the
offense of extortion 'under color of official right'
prohibited by the Hobbs Act."  <u>Id</u>. at 256.

   Evans was an elected member of a Georgia county
commission.  An FBI agent posed as a real estate investor
and, over the course of several months, requested Evans's
assistance in re-zoning a plot of land.  At the end of
one meeting, the agent handed Evans an envelope with
$ 7,000 in cash and a $ 1,000 check made payable to
Evans's campaign.  Evans reported the check, but not the
cash. Evans contended that both the cash and the check

were campaign contributions.  Evans was prosecuted on the
theory that his "acceptance of the bribe constituted an
implicit promise to use his official position to serve
the interests of the bribegiver."  Id. at 257.

Regarding the question presented, the Court held that
an affirmative act of inducement was not required for a
conviction under the Hobbs Act.  Id. at 265-66.  It is
irrelevant whether the public official initiated the
bribe payment.

Evans also challenged the jury instructions as a
violation of McCormick's quid pro quo requirement.  The
jury instructions stated in relevant part: "if a public
official demands or accepts money in exchange for [a]
specific requested exercise of his or her official power,
such a demand or acceptance does constitute a violation
of the Hobbs Act regardless of whether the payment is
made in the form of a campaign contribution."  Id. at 258
(alteration in original).  In rejecting Evans's argument,
the Court reasoned that "the offense is completed at the

16

time when the public official receives a payment in return for his agreement to perform specific official acts; fulfillment of the quid pro quo is not an element of the offense." Id. at 268. The Court further explained that: "We hold today that the Government need only show that a public official has obtained a payment to which he was not entitled, knowing that the payment was made in return for official acts." Id.[2] In other words, a quid pro quo needs to be for a specific action. Whether the politician actually follows through on the agreement is not necessary for a conviction.

In his concurring opinion, Justice Kennedy argued that the last sentence quoted above "can be interpreted

_____

2. Part of the confusion about Evans's holding may stem from Justice Thomas's dissent, which addressed an unbriefed argument. Justice Thomas contended that extortion was limited to wrongful takings under false pretense of official right. When extortion is involved, only the public official is the wrongdoer; but in a bribery case, both the official and the bribegiver may be at fault. Id. at 283 (Thomas, J., dissenting). The Evans Court rejected this argument, albeit in a section of the opinion that did not address the quid pro quo standard. Id. at 269-71 (majority opinion).

in a way that is consistent" with <u>McCormick</u>'s quid pro quo requirement. <u>Id</u>. at 272 (Kennedy, J., concurring in part and concurring in the judgment).[3]  Justice Kennedy conceded that the Court's opinion could be read as holding that a quid pro quo was "an alternative rationale" for conviction. <u>Id</u>. at 273.  But the <u>Evans</u> jury did convict on a quid pro quo theory. <u>Id</u>.

Justice Kennedy then expanded on his definition of a quid pro quo:

> "The requirement of a <u>quid pro quo</u> means that without pretense of any entitlement to the payment, a public official violates [the Hobbs Act] if he intends the payor to believe that absent payment the official is likely to abuse his office and his trust to the detriment and injury of the prospective payor or to give the prospective payor less favorable treatment if the quid pro quo is not satisfied. <u>The official and the payor need not state the quid pro quo in express terms, for otherwise the law's effect could be frustrated by knowing winks and nods.</u> The inducement from the

---

3. Justice Thomas's dissent interpreted the majority opinion as requiring a quid pro quo, which he regarded as a "made up" standard but a "step in the right direction." <u>Id</u>. at 287 (Thomas, J., dissenting).

> official is criminal if it is express or
> if it is implied from his words and
> actions, so long as he intends it to be
> so and the payor so interprets it."

Id. at 274 (second emphasis added). Thus, according to Justice Kennedy, a quid pro quo need not be expressly stated orally or put in writing. Rather, an explicit quid pro quo could be inferred from vague words and conduct. The "explicit" requirement encompasses both "express" comments and "implied" behavior.

Justice Kennedy's distinction between an "express" versus an "implied" quid pro quo becomes salient in the final case of this trilogy.

C. Siegelman and Express

The last case that addresses the quid pro quo standard also comes from Alabama. In United States v. Siegelman, 640 F.3d 1159 (11th Cir. 2011), former Governor Don Siegelman and healthcare executive Richard Scrushy were convicted of federal-programs bribery, conspiracy, and honest-services mail fraud. The

convictions were premised on a "corrupt agreement whereby Scrushy gave Siegelman $ 500,000 in exchange for Siegelman's appointing him to Alabama's Certificate of Need Review Board," which controlled the licensing of healthcare facilities in the State.   Id. at 1164. Scrushy effectuated the scheme by funneling money to an issue-advocacy group that Siegelman controlled.

On appeal, the defendants asserted that the jury instructions "failed to tell the jury not only must they find that Siegelman and Scrushy agreed to a quid pro quo ... but that this agreement had to be express."   Id. at 1171 (emphasis in original).   According to the defendants, a quid pro quo required evidence of actual conversations, either oral or written.   In other words, defendants contended that an explicit quid pro quo had to be stated expressly.

The Eleventh Circuit rejected this argument.   The court interpreted McCormick's use of the word "explicit" to describe "the sort of agreement that is required to

20

convict a defendant for extorting campaign contributions. Explicit, however, does not mean _express_." _Id_. (emphasis in original). Rather, the _Siegelman_ court read _Evans_ as clarifying that an agreement must be in "return for a _specific_ official action--a _quid pro quo_. No generalized expectation of some future favorable action will do." _Id_. (emphasis in original). Under both _McCormick_ and _Evans_, therefore, "there is no requirement that [an] agreement be memorialized in writing, or even ... be overhead by a third party." _Id_. Such a burdensome requirement would not only be impractical but would also allow defendants "to escape criminal liability through 'knowing winks and nods.'" _Id_. (quoting _Evans_, 504 U.S. at 274 (Kennedy, J., concurring in part and concurring in the judgment)).

D. Current State of the Law

As this case demonstrates, there is considerable debate over what _McCormick_, _Evans_, and _Siegelman_ require.

The defendants argued that campaign contributions could not be considered "bribes" under the federal-programs bribery statute. The defendants rehashed the arguments raised in <u>Siegelman</u> that an explicit quid pro quo had to be express. The defendants also asserted that a quid pro quo had to be an agreement rather than a promise or solicitation. According to the defendants, the bribegiver and the politician had to reach a corrupt bargain; under this theory, a bribegiver making an offer in exchange for the politician's vote would be insufficient. McGregor's Proposed Jury Instructions (Doc. No. 1195), 6-17.

The Circuit Courts of Appeals have struggled with these questions. The Second Circuit, for example, has limited <u>Evans</u> to non-campaign contribution bribes even though the defendant in <u>Evans</u> claimed that the payments were campaign contributions. Moreover, the Second Circuit interpreted <u>Evans</u> as holding that, in the non-campaign contribution context, a quid pro quo need not be

explicit.  <u>United States v. Ganim</u>, 510 F.3d 134, 142-44 (2d Cir. 2007).  <u>See</u> <u>also</u> <u>United States v. Abbey</u>, 560 F.3d 513, 517-18 (6th Cir. 2009) (adopting a similar rationale).  By contrast, the Fourth Circuit has read <u>Evans</u> as applying to campaign contributions but referred to the quid pro standard as "not onerous."  <u>United States v. Hairston</u>, 46 F.3d 361, 365 (4th Cir. 1995).

The question, then, is how to harmonize <u>McCormick</u>, <u>Evans</u>, and <u>Siegelman</u>.

## IV.  DISCUSSION

The court believes that its jury instructions clarified the law in numerous ways.  As an initial matter, the instructions have a long introduction about the appropriateness of privately funded campaigns.  This language provides context for how campaigns are actually funded and reminds the jury that a mere coincidence of interest between the alleged bribegiver and official is insufficient to sustain a conviction.

More importantly, the court's instructions attempted to resolve the quid pro quo debate. Too often, courts have conflated a "quid pro quo" with an agreement. But a quid pro quo is simply Latin for "this for that." Federal corruption laws are not limited to completed agreements to exchange a vote for a campaign contribution. Thus, the court's instructions distinguished between a quid pro quo <u>agreement</u> and a quid pro quo <u>promise</u> or <u>solicitation</u>.

An agreement is the paradigmatic example of a corrupt quid pro quo. An agreement requires a 'meeting of the minds' and typically results from negotiations about the 'price,' i.e. how much bribe money is needed to purchase a specific official action. In other words, a quid pro quo agreement is a corrupt bargain that exchanges a specific official action for a campaign contribution.

By contrast, a promise or solicitation is one-sided. Federal corruption laws criminalize the offering of a bribe (a promise) or a request for a bribe (a

solicitation). The court, therefore, rejected the defendants' argument that a solicitation was insufficient for a conviction because one-sided extortion is still criminal. An extortionate politician should not go free merely because the victim refuses the corrupt bargain. And yet, a rule requiring a quid pro quo <u>agreement</u> would have that perverse result.

A few hypothetical scenarios may prove useful:

<u>Quid Pro Quo Agreement</u>: Mayor Doe tells businesswoman Jones that he will award her company a contract if she donates $ 5,000 to his campaign. Jones responds by affirming that she will send a check for $ 5,000 to Doe's campaign the next day.

<u>Quid Pro Quo Promise</u>: Businesswoman Jones tells Mayor Doe that she will donate $ 5,000 to Doe's campaign if he awards her company a contract.

<u>Quid Pro Quo Solicitation</u>: Mayor Doe tells businesswoman Jones that he will award her company a contract if she donates $ 5,000 to his campaign.

As these examples illustrate, a party's criminal liability can be determined based upon these distinctions. An agreement makes both parties liable.

A promise may implicate only the bribegiver, while a solicitation may make only the public official liable.

In delineating between these concepts, the court was careful to include additional requirements for a quid pro quo promise or solicitation. Under the court's instructions, the jury could find a quid pro quo agreement if there was a corrupt exchange for a <u>specific</u> official action. However, for a quid pro quo promise or solicitation, the jury had to conclude that the corrupt exchange was specific, explicit, and material. The court adopted these distinctions for several reasons.

First, unlike the Second and Sixth Circuits, this court interprets <u>Evans</u> as applying in the campaign-contribution context. Evans was prosecuted both for the $ 7,000 in cash and the $ 1,000 check made payable to his campaign. <u>Evans</u>, 504 U.S. at 257. Moreover, the <u>Evans</u> trial court instructed the jury that Evans believed that the "$ 8,000 he received from [the FBI agent] was a campaign contribution." <u>Id</u>. The Second and Sixth

Circuits misread the factual background in <u>Evans</u> when they cabined that decision to non-campaign contribution bribes. <u>See</u> <u>Ganim</u>, 510 F.3d at 143 (noting that "<u>Evans</u> modified [<u>McCormick</u>'s] standard in non-campaign contribution cases") (quoting <u>United States v. Garcia</u>, 992 F.2d 409, 414 (2d Cir. 1993)); <u>Abbey</u>, 560 F.3d at 517-18 (same).

Similarly, this court disagrees with the contention that <u>Evans</u> dilutes <u>McCormick</u>. The <u>Evans</u> Court granted certiorari to determine whether an "inducement" was a necessary element for conviction under the Hobbs Act. <u>Evans</u>, 504 U.S. at 256. When the <u>Evans</u> Court stated that "the Government need only show that a public official has obtained a payment to which he was not entitled, knowing that the payment was made in return for official acts," <u>id</u>. at 268, it was simply not addressing the quid pro quo standard. The Supreme Court was reiterating that an inducement need not be proven for a conviction. Indeed, the bulk of the Court's opinion focuses on the

"inducement" argument; the Court's discussion of the quid

pro quo standard was tangential to the decision. As the

D.C. Circuit Court of Appeals succinctly put it:

> "Also misplaced is the government's
> reliance on the Supreme Court's
> statement in <u>Evans</u> that the <u>quid pro quo</u>
> requirement is satisfied where it is
> established that 'a public official has
> obtained a payment to which he was not
> entitled, knowing that the payment was
> made in return for official acts.' The
> question in <u>Evans</u> was 'whether an
> affirmative act of inducement by a
> public official, such as a demand, is an
> element of the offense of extortion'
> prohibited by 18 U.S.C. § 1951. The
> statement relied upon by the government
> was nothing more than an answer by the
> Court to that question."

<u>United States v. Dean</u>, 629 F.3d 257, 260 (D.C. Cir. 2011)

(internal citations omitted) (quoting <u>Evans</u>, 504 U.S. at

268 & 256).

Second, this court included the "explicit" and

"material" requirements for quid pro quo promises and

solicitations because one-sided offers can be

misinterpreted. A higher threshold is therefore

appropriate in order to protect political speech.

Indeed, under contract law, promises are not normally actionable.  Justice Kennedy analogized to contract law in his <u>Evans</u> concurrence, explaining that "a <u>quid pro quo</u> with the attendant corrupt motive can be inferred from an ongoing course of conduct." <u>Evans</u>, 504 U.S. at 274 (Kennedy, J., concurring in part and concurring in the judgment).  This court drew upon this language when it instructed the jury that whether a promise or solicitation was "explicit" could "be inferred from both direct and circumstantial evidence, including the defendant's words, conduct, acts, and all the surrounding circumstances disclosed by the evidence, as well as the rational or logical inferences that may be drawn from them."  Jury Instructions (Doc. No. 2388) at 23.

The court further defined "material" as an offer "that a reasonable person would view as having the capacity or natural tendency to influence a person's decision." Jury Instructions (Doc. No. 2388) at 24.  The

material requirement ensures that jokes or promises of a pittance do not trigger criminal liability.

For a quid prop quo agreement, this court required only a specificity showing because agreements are, by definition, explicit. Under the court's instructions, an agreement is "a mutual understanding, between the donor and the elected official." Jury Instructions (Doc. No. 2388) at 22. Once again, under contract law, such a 'meeting of the minds' demonstrates that the terms of the agreement have been formalized--whether through writing, oral statements, winks and nods, or conduct. When there is a quid pro quo agreement, "the official asserts that his official conduct will be controlled by the terms of the promise or undertaking." McCormick, 500 U.S. at 273. A corrupt offer and acceptance (or request and acceptance) requires actions by two parties, thereby making the corrupt bargain explicit and reducing the possibility of misinterpretation.

Additionally, the court did not include a "material" requirement for quid pro quo agreements because agreements have been negotiated and consented to.  If a politician is willing to sell his vote for a steak dinner and the bribegiver agrees, that deal should still trigger criminal liability.

Finally, the court rejected the defendants' argument that a bribe offer has to be "express" because <u>Siegelman</u> provides controlling authority.  As the Eleventh Circuit recognized, an "express" requirement creates an unrealistic burden, especially if there are no electronic recordings of the relevant conversations or if sophisticated actors are offering or requesting bribes.

*  *  *

It is often true that "unexamined assumptions have a way of becoming, by force of usage, unsound law." <u>McCormick</u>, 500 U.S. at 280 (Scalia, J., concurring).  In the public-corruption context, courts have been

31

particularly lax in the use of certain words--explicit, express, agreement, promise, and quid pro quo--that should have clear legal meanings. Imprecise diction has caused considerable confusion over the scope of federal corruption laws as applied to campaign contributions. Uncertainty in this area of law breeds corruption and chills legitimate political speech.

Much ink has been spilled over the contours of campaign finance law. Far less attention has been paid to what actually constitutes a "bribe." A precise definition of "bribery" could bring coherence to campaign finance jurisprudence, as the government's interest in curbing corruption is now the sole basis for placing limits on campaign contributions. See Citizens United v. FEC, 130 S. Ct. 876, 912 (2010) (rejecting the anti-distortion rationale for campaign finance restrictions).

The court hopes that its jury instructions and this opinion have helped clarify the case law. Ultimately, the Supreme Court needs to address this issue and provide

guidance to lower courts, prosecutors, politicians, donors, and the general public.

DONE, this the 24th day of July, 2012.

<u>    /s/ Myron H. Thompson    </u>
UNITED STATES DISTRICT JUDGE